UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION


UNITED STATES OF AMERICA,

       Plaintiff,

                                            Case No. 2:08-cr-25
v.                                        HON. ROBERT HOLMES BELL

BRIAN KENNETH ANDERSON,

       Defendant.

_____/


**REPORT AND RECOMMENDATION**


       Defendant Brian Kenneth Anderson is charged in a one-count superseding indictment

with felon in possession of a firearm, in violation of 18 U.S.C. §§ 922(g)(1), 921 (a) and 924(a)(2).

Defendant has filed a Motion to Suppress Statements and the Physical Fruits of the Constitutional

Violations. The parties have fully briefed the issues and a hearing was held on September 18, 2008.

Testifying at the hearing were Officer Kurt Erkkila of the Laurium Police Department and Chief

David Outinen of the Calumet Police Department.

       The testimony at the hearing revealed the following. On May 19, 2008, Officer Kurt

Erkkila received a telephone call from Gina Skipper of Florida. Gina Skipper told the officer that

her sister, Lisa Arceci, and another woman named Jana were staying in defendant's apartment in

Laurium.[1] According to Gina Skipper, her sister indicated that defendant had threatened Jana with

a gun, a shot had been fired in the apartment, and defendant had disconnected the telephone while

---

[1]Officer Erkkila had met Lisa Arceci at the local hospital a few days before this incident. Officer Erkkila believed that Arceci had been in the hospital for an alcohol related reason. Officer Erkkila drove Arceci to defendant's residence.

Gina Skipper was talking to her sister.  As a result, Officer Erkkila contacted Chief David Outinen and Chief Josh Peters of the Lake Linden Police Department for assistance, with the intention of performing a well being check at the apartment where the three individuals resided.  Officer Erkkila and Chief Outinen then went to the apartment.

The location of the apartment and the defendant were familiar to the officers.  The officers had previously responded to complaints at the apartment and each officer had been involved with numerous calls involving defendant.  The officers met Lisa Arceci at the door of the apartment.  In the presence of defendant, Arceci invited the officers inside the apartment.  Defendant did not object to the officers' presence in the apartment.  The officers were standing in the living room/kitchen area of the apartment.  Arceci informed the officers that defendant had two guns in the apartment, a shotgun and a handgun.  Defendant denied having guns in the apartment. Jana Rascona was present in the apartment and appeared intoxicated.  Lisa Arceci took Chief Outinen into the laundry room and showed the Chief where a bullet had gone through the washing machine.  Chief Outinen asked defendant where the guns were.  Defendant acknowledged that the guns were in the apartment and that the handgun had belonged to his father.  Defendant tried to show the officers the location of the handgun in his bedroom night stand, but the women had hidden the handgun so it was not where defendant had indicated.  Defendant consented to allow the officers to search for the handgun. Defendant took Chief Outinen to a partially disassembled shotgun that was found behind a door where the washing machine was located.

Meanwhile, defendant, Arceci and Rascona were arguing with each other. Defendant was taken outside to separate him from the women.  The women remained inside.  Officer Erkkila remained with defendant, who was placed in the back of the patrol car with the door open, while Chief Outinen went back inside the apartment to speak with the two women.  Rascona lead Chief

Outinen to where she had hidden the handgun.  Chief Outinen seized the gun which contained three live rounds and one spent round.

Officer Erkkila was interviewing defendant when Chief Outinen came back outside with the handgun.  The interview, which took place while defendant was seated in the backseat of the patrol car, involved questions about assaults against Rascona and Arceci.  Defendant gave his version of what had happened and admitted that he had recently taken the handgun from his mother's house after he had received some threats.  Defendant's breath was analyzed using a portable breath test machine which registered .065 percent.  Chief Outinen suspected that defendant was on probation and confirmed his suspicion through dispatch.  Defendant was on probation at the time and was not supposed to consume alcohol.  After his interview, defendant was arrested for felonious assault and a probation violation.  Defendant did not receive *Miranda* warnings.

On May 20, 2008, Special Agent Timothy DeClaire of the Bureau of Alcohol, Tobacco, Firearms and Explosives and Officer Erkkila interviewed defendant.  Defendant was advised of his *Miranda* warnings.  Defendant admitted orally and in writing to possessing the shotgun and handgun.

Defendant moves to suppress his statements and the seizure of the guns in his apartment as unlawfully obtained evidence.  Defendant argues that it was unlawful for the police to enter his residence, search his residence, seize the guns, make an arrest without a warrant, and interview him without first giving him *Miranda* warnings.  The government asserts that the search was justified by exigent circumstances because the officers needed to take control of the situation which involved domestic violence and knowledge that there were guns in the residence.  Further, the government asserts that the officers obtained consent to enter and search the residence.

Defendant argues that, absent a warrant, the police officers had no right to enter his residence and arrest him.  A valid arrest warrant authorizes the police to enter a residence if the officer believes that the suspect is inside.  *Payton v. New York*, 445 U.S. 573, 100 S. Ct. 1371 (1980).  In the opinion of the undersigned, the officers were justified in entering the residence and searching the residence for two separate reasons.  First, there existed exigent circumstances to enter the residence and search for the weapons based upon the officers' knowledge at the time they first knocked on the door and encountered Lisa Arceci.  Second, the officers received consent to enter the residence and to search the premises.  The Sixth Circuit has stated:

> While it is not possible to articulate a succinct yet exhaustive list of circumstances that qualify as exigent, we have previously characterized the situations in which warrantless entries are justified as lying within one of four general categories: (1) hot pursuit of a fleeing felon, (2) imminent destruction of evidence, (3) the need to prevent a suspect's escape, and (4) a risk of danger to the police or others. *United States v. Johnson*, 22 F.3d 674, 680 (6th Cir.1994).

*United States v. Rohrig*, 98 F.3d 1506, 1515 (6th Cir. 1996).

Officer Erkkila testified that Ms. Skipper contacted him by telephone to inform him that defendant had threatened the two women in the apartment, assaulted one with a gun, and disconnected the telephone while Skipper was talking to her sister Lisa Arceci.  Officer Erkkila was familiar with defendant and the location of his apartment.  He immediately called for back-up and proceeded to the location of defendant's apartment.  He was greeted at the door by Lisa Arceci.  Officer Erkkila described Arceci as upset.  Arceci informed the officers that defendant had guns in the residence.  In the opinion of the undersigned, the officers were justified based upon the information that they had to enter the residence and search for the guns in an attempt to prevent a risk of danger to themselves and the occupants in the apartment.

- 4 -

As the Supreme Court explained in *Warden v. Hayden*, 387 U.S. 294 (1967):

> The police were informed that an armed robbery had taken place, and
> that the suspect had entered 2111 Cocoa Lane less than five minutes
> before they reached it. They acted reasonably when they entered the
> house and began to search for a man of the description they had been
> given and for weapons which he had used in the robbery or might use
> against them. The Fourth Amendment does not require police officers
> to delay in the course of an investigation if to do so would gravely
> endanger their lives or the lives of others. Speed here was essential,
> and only a thorough search of the house for persons and weapons
> could have insured that Hayden was the only man present and that the
> police had control of all weapons which could be used against them
> or to effect an escape.

*Id*. at 298-299.

The government argues that the officers were given consent to enter the residence because they were invited inside by Lisa Arceci.  Voluntary consent by a third party who has joint access and control of the premises is generally valid against the co-occupant.  *United States v. Matlock*, 415 U.S. 164, 169 (1974).

> The Fourth Amendment recognizes a valid warrantless entry and
> search of premises when police obtain the voluntary consent of an
> occupant who shares, or is reasonably believed to share, authority
> over the area in common with a co-occupant who later objects to the
> use of evidence so obtained.

*Georgia v. Randolph*, 547 U.S. 103, 121 (2006), citing  *Illinois v. Rodriguez*, 497 U.S. 177 (1990), and *United States v. Matlock*.  However, consent to search will not be authorized against an objecting potential defendant who is present at the time consent was given by the third party.  *Randolph*, 547 U.S. at 121.

> Common authority is not to be implied from the mere property
> interest a third party has in the property, . . . but rests on mutual use
> of the property by persons generally having joint access or control for
> most purposes. . . .  *Id.* at 171 n. 7, 94 S.Ct. 988. The burden of
> establishing that common authority rests upon the State. *Rodriguez*,
> 497 U.S. at 181, 110 S.Ct. 2793.  The exception for consent extends

> even to entries and searches with the permission of a co-occupant whom the police reasonably, but erroneously, believe to possess shared authority as an occupant. *Georgia v. Randolph,* 547 U.S. 103, 109, 126 S.Ct. 1515, 164 L.Ed.2d 208 (2006) (citing *Rodriguez,* 497 U.S. at 186, 110 S.Ct. 2793). In other words, a search consented to by a third party without actual authority over the premises is nonetheless valid if the officers reasonably could conclude from the facts available that the third party had apparent authority to consent to the search. *See Rodriguez,* 497 U.S. at 186-89, 110 S.Ct. 2793. But if a potential defendant with self interest in objecting to the search is present and actually objects, then a third party's permission does not suffice for a reasonable search. *Randolph,* 547 U.S. at 121, 126 S.Ct. 1515. If that potential objector is "nearby but not invited to take part in the threshold colloquy," on the other hand, that potential objector "loses out," and the search will be deemed valid. *Id.*

*United States v. Ayoub*, 498 F.3d 532, 537 (6th Cir. 2007). In the opinion of the undersigned, the officers received consent to enter the residence and search the apartment. Arceci had apparent authority, if not actual authority, to consent to the search of the apartment. *See Rodriguez*, 497 U.S. 177. Defendant was present when the officers arrived at his apartment and he voiced no objection when Lisa Arceci invited the officers inside the apartment. Defendant voiced no objections when Lisa Arceci took Chief Outinen to see the bullet hole in the washing machine. As stated in *Ayoub*, defendant's failure to voice any objections to the entry and search of his premises renders the search valid.

The officers were faced with a domestic violence situation. Both officers testified that it is standard procedure to separate the parties. The two women and defendant began arguing in the residence. In order to calm the situation, the officers chose to take defendant outside. Defendant was informed that he was not under arrest. He was seated in the back of the patrol car with the door open. Defendant argues that any statements that he made should be suppressed because they were made without any *Miranda* warnings given. The Supreme Court has stated:

> We conclude that the *Miranda* safeguards come into play whenever a person in custody is subjected to either express questioning or its functional equivalent. That is to say, the term "interrogation" under *Miranda* refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect. The latter portion of this definition focuses primarily upon the perceptions of the suspect, rather than the intent of the police. This focus reflects the fact that the *Miranda* safeguards were designed to vest a suspect in custody with an added measure of protection against coercive police practices, without regard to objective proof of the underlying intent of the police. A practice that the police should know is reasonably likely to evoke an incriminating response from a suspect thus amounts to interrogation. But since the police surely cannot be held accountable for unforeseeable results of their words or actions, the definition of interrogation can extend only to words or actions on the part of police officers that they *should have known* were reasonably likely to elicit an incriminating response.

*Rhode Island v. Innis*, 446 U.S. 291, 300-02, 100 S. Ct. 1682, 1689-90 (1980). It is well settled that statements made voluntarily by the defendant are admissible and not a violation of *Miranda*. *Miranda v. State of Arizona*, 384 U.S. 436, 478, 86 S. Ct. 1602, 1630 (1966). Defendant argues that as soon as the officers entered defendant's residence, he was in custody for purposes of *Miranda* and all of his statements must be suppressed.

The government argues that defendant was detained as part of a *Terry* investigation and was not under arrest at the time he made his statements. The rule in *Terry v. Ohio*, 392 U.S. 1 (1968), has been expanded to include investigative stops and temporary seizures based upon suspicion of various types of criminal activities. *United States v. Obasa*, 15 F.3d 603, 607 (6th Cir. 1994). In the opinion of the undersigned, the statements made by defendant were voluntary and made while the officers were investigating the disturbance. Defendant voluntarily stated that he did have guns and did show the officers where the shotgun was located in the apartment and attempted, unsuccessfully, to find the handgun. Clearly, when defendant made these statements he was not

under arrest.  In addition, the officers were faced with a very dangerous situation.  The individuals

in the apartment had been drinking and were excited, if not upset.  There was information that a gun

had been fired in the apartment.  There was some history of domestic violence and an allegation that

the telephone had been disabled.

In *New York v. Quarles*, 467 U.S. 649 (1984), police officers had questioned Quarles

regarding the location of a gun.  Quarles was in custody and interrogated without *Miranda* warnings

being administered.  As the Supreme Court explained:

> We hold that on these facts there is a "public safety" exception to the
> requirement that *Miranda* warnings be given before a suspect's
> answers may be admitted into evidence, and that the availability of
> that exception does not depend upon the motivation of the individual
> officers involved. In a kaleidoscopic situation such as the one
> confronting these officers, where spontaneity rather than adherence
> to a police manual is necessarily the order of the day, the application
> of the exception which we recognize today should not be made to
> depend on post hoc findings at a suppression hearing concerning the
> subjective motivation of the arresting officer.
>
> Undoubtedly most police officers, if placed in Officer Kraft's position
> would act out of a host of different, instinctive, and largely
> unverifiable motives--their own safety, the safety of others, and
> perhaps as well the desire to obtain incriminating evidence from the
> suspect.
>
> Whatever the motivation of individual officers in such a situation, we
> do not believe that the doctrinal underpinnings of *Miranda* require
> that it be applied in all its rigor to a situation in which police officers
> ask questions reasonably prompted by a concern for the public safety.
> The *Miranda* decision was based in large part on this Court's view
> that the warnings which it required police to give to suspects in
> custody would reduce the likelihood that the suspects would fall
> victim to constitutionally impermissible practices of police
> interrogation in the presumptively coercive environment of the station
> house. 384 U.S., at 455-458, 86 S.Ct., at 1617-1619. The dissenters
> warned that the requirement of *Miranda* warnings would have the
> effect of decreasing the number of suspects who respond to police
> questioning. *Id.*, at 504, 516-517, 86 S.Ct., at 1643, 1649-1650
> (Harlan, J., joined by Stewart and WHITE, JJ., dissenting). The

*Miranda* majority, however, apparently felt that whatever the cost to society in terms of fewer convictions of guilty suspects, that cost would simply have to be borne in the interest of enlarged protection for the Fifth Amendment privilege.

The police in this case, in the very act of apprehending a suspect, were confronted with the immediate necessity of ascertaining the whereabouts of a gun which they had every reason to believe the suspect had just removed from his empty holster and discarded in the supermarket. So long as the gun was concealed somewhere in the supermarket, with its actual whereabouts unknown, it obviously posed more than one danger to the public safety: an accomplice might make use of it, a customer or employee might later come upon it.

In such a situation, if the police are required to recite the familiar *Miranda* warnings before asking the whereabouts of the gun, suspects in Quarles' position might well be deterred from responding. Procedural safeguards which deter a suspect from responding were deemed acceptable in *Miranda* in order to protect the Fifth Amendment privilege; when the primary social cost of those added protections is the possibility of fewer convictions, the *Miranda* majority was willing to bear that cost. Here, had *Miranda* warnings deterred Quarles from responding to Officer Kraft's question about the whereabouts of the gun, the cost would have been something more than merely the failure to obtain evidence useful in convicting Quarles. Officer Kraft needed an answer to his question not simply to make his case against Quarles but to insure that further danger to the public did not result from the concealment of the gun in a public area.

We conclude that the need for answers to questions in a situation posing a threat to the public safety outweighs the need for the prophylactic rule protecting the Fifth Amendment's privilege against self-incrimination. We decline to place officers such as Officer Kraft in the untenable position of having to consider, often in a matter of seconds, whether it best serves society for them to ask the necessary questions without the *Miranda* warnings and render whatever probative evidence they uncover inadmissible, or for them to give the warnings in order to preserve the admissibility of evidence they might uncover but possibly damage or destroy their ability to obtain that evidence and neutralize the volatile situation confronting them.

*Id*. at 656-658.

In addition, after defendant was placed in the patrol car he was told that he was not under arrest.  Placement in a patrol car during an investigatory detention does not turn an investigatory detention immediately into an arrest.  *United States v. Jacob*, 377 F.3d 573, 580 (6th Cir. 2004).   Defendant was seated in the patrol car simply to separate him from the two women in the residence.  Statements made by defendant while in the patrol car were voluntary and were not a violation of *Miranda*.  The incriminating statements made the next day were made after *Miranda* warnings were read and after defendant indicated that he understood those warnings.

Accordingly, it is recommended that defendant's Motion to Suppress Statements and the Physical Fruits of the Constitutional Violations (Docket #16) be denied.

NOTICE TO PARTIES:  Objections to this Report and Recommendation must be served on opposing parties and filed with the Clerk of the Court within ten (10) days of receipt of this Report and Recommendation.  28 U.S.C. § 636(b)(1)(C); Fed. R. Civ. P. 72(b); W.D. Mich. LCivR 72.3(b).  Failure to file timely objections constitutes a waiver of any further right to appeal.  *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).  *See also Thomas v. Arn*, 474 U.S. 140 (1985).

 /s/ Timothy P. Greeley
TIMOTHY P. GREELEY
UNITED STATES MAGISTRATE JUDGE

Dated:   October 6, 2008